STATE OF VERMONT
ENVIRONMENTAL COURT

| | } | |
|---|---|---|
| In re Sheldrick Building Permit | } | Docket No. 185-9-07 Vtec |
| (Appeal of Bennett and Naritomi) | } | (appeal of municipal building permit) |
| | } | |

## Amended Merits Decision[1]

Donald and Heidi Sheldrick sought and obtained a zoning permit from the Town of Charlotte Zoning Administrator for the construction of a two-bay garage/workshop ("Proposed Workshop" or "Workshop") at their home at 1091 Roscoe Road.  Appellants Stuart Bennett and Patti Naritomi ("Appellants") filed a timely appeal of the Zoning Administrator's issuance of the Sheldrick permit.  When the Town of Charlotte Zoning Board of Adjustment ("ZBA") upheld the issuance of the Sheldrick building permit, Appellants filed a timely appeal with this Court.[2]

Appellants presented three issues for this Court's review in their Statement of Questions.  When this Court's Interim Decision of May 30, 2008, on the parties' cross-motions for summary judgment ("Interim Decision") resolved some, but not all of the issues presented, this matter proceeded to trial, which was completed over two days.  The Court conducted a site visit of the subject property and the surrounding neighborhood prior to addressing the parties' summary judgment motions.  The site visit also assisted the Court by putting the evidence received at trial into context.

## Procedural Background

By our Interim Decision on the parties' summary judgment cross-motions, we reduced the legal issues requiring adjudication at trial, specifically holding that the following two issues were all that remained of the challenges Appellant preserved for our review in this appeal.  We concluded that the first issue to address was whether the Proposed Workshop would be "subordinate . . . to the principal structure and use" as that phrase is used in §§ 3.6(A)(2) and 10.2 of the Town of Charlotte Land Use Regulations ("Regulations").  Interim Decision at 6–10.

---

[1]   This Amended Merits Decision supersedes the Merits Decision that was issued on April 1, 2009, and is issued in connection with the granting of Appellants' motion for amendment of judgment, specifically for the purpose of clarifying the permit conditions.  See Entry Order dated April 23, 2009.

[2]   Appellants are represented by Vincent A. Paradis, Esq.; Appellee-Applicants Donald and Heidi Sheldrick ("Applicants") are represented by Liam L. Murphy, Esq.; the Town of Charlotte is represented by John H. Klesch, Esq.; and Annemarie Curlin, appearing in this proceeding as an interested person, represents herself.

We also concluded that the second and remaining issue to address at trial was whether the Proposed Workshop and its use for a home occupation conforms to the Performance Standards itemized in Regulations § 3.12. Id. at 10–11.

Our Interim Decision clarified some further legal issues that bear repeating in this Merits Decision. First, we note that Applicants' only pending zoning request is for permission to build their Proposed Workshop as a lawful accessory structure and that the only disputed issue is whether their accessory structure is "subordinate" to their dwelling and residential use of their property. Id. at 6–9.[3] As to the use of the Proposed Workshop, Applicants contend that they are not required to obtain a use permit for their Workshop, since their activities may be classified as a home occupation that does not require a permit. Id. at 9–10; see also Regulations § 4.11(A)(1). We reserved responding to Applicants' contention on the home occupation issue, subject only to addressing the subordination and performance standard issues being addressed at trial. Interim Decision at 10.

Within the context of these remaining legal issues, we render the following Findings of Fact from the evidence admitted at trial, including that evidence put into context by the site visit the Court conducted with the parties prior to trial:

**Findings of Fact**

1. Applicants own a four-acre parcel of land on the easterly side of Roscoe Road. The property is located in the Rural Zoning District, as defined by Regulations Table 2.5. Presently situated on Applicants' property is a single family dwelling, a detached garage, a horse barn, a run-in shed for horses and other animals, and a temporary workshop/garage. The existing buildings on Applicants' property are depicted in the photos admitted in to evidence at trial as Exhibits H-1 through H-6, and are shown by the demonstrative model prepared by Appellants' expert and admitted in to evidence at trial as Exhibits 11 through 11-6.

2. Mrs. Sheldrick has lived in this neighborhood her whole life. The Sheldricks purchased the subject property from Mrs. Sheldrick's parents; Mrs. Sheldrick first resided on the property in 1997 in a mobile home, which was later replaced by the existing dwelling.

3. The existing dwelling, constructed in 1999, measures 28' x 32' and includes a 12' x 8' enclosed mudroom, a 6' x 8' front porch, and a 12' x 16' rear deck. Thus, the footprint of the existing dwelling comprises approximately 1,232 square feet. With three floors of finished

---

[3] There has been no contest of Applicants' representation that their Proposed Workshop conforms to setback and density requirements for the Rural Zoning District.

living space, the cumulative floor space of the dwelling comprises approximately 2,832 square feet. The dwelling is depicted on Applicants' Exhibit H-1.

4. The dimensions of the outbuildings on the property are as follows:

    a. detached garage is 24' x 40', with a footprint of 960 square feet;

    b. horse barn is 12' x 60', with a footprint of 720 square feet;

    c. run-in shed for animals is 10' x 12', with a footprint of 120 square feet; and

    d. temporary garage is 14' x 32', with a footprint of 488 square feet.

Therefore, the total existing building coverage on the property, including the dwelling and the outbuildings, is 3,520 square feet, which represents approximately 2% building coverage for the four-acre parcel.

5. Applicants obtained a zoning permit in October of 2007 to construct the temporary garage and use it for the purpose of their home occupation truck repair business. Applicants have pledged to remove the temporary garage, if they receive permission to construct and use the Proposed Workshop.

6. With the exception of the temporary garage, all of the existing buildings on Applicants' property are used as their primary residence or in connection with their primary residence and to house their personal hobbies, including the raising of horses and other animals. None of these existing buildings (again, with the exception of the temporary garage) are used for commercial or business-related purposes.[4]

7. Mr. Sheldrick first lived at the subject property in 2003; he has performed some type of occupational work on the property since he first moved there, beginning with the repair of truck drive shafts at his home while he worked away from home at a machine shop.

8. He began his home-based business of repairing large trucks in 2004. Many of the trucks he services are delivery trucks, including trucks that deliver fuel, lumber, beverages, and other supplies. The largest trucks he services are logging trucks, with a self-contained boom and claw to stack logs.

9. Trucks are commonly identified by various classes, ranging from class 1 (which includes utility vans and full-sized pick up trucks) to class 8 (which includes dump and cement trucks). A copy of a truck classification table, with truck examples, was admitted as Applicants' Exhibit P.

---

[4] Mr. Sheldrick once used a portion of his existing garage to store work tools and supplies, but this practice will cease once the Proposed Workshop is completed.

The majority of trucks Mr. Sheldrick repairs are in the class 6 and 7 category, with an occasional truck in the class 8 category.

10.     The truck repair business requires Mr. Sheldrick to travel to the disabled truck and to often repair the truck away from his home; Mr. Sheldrick performs an average of up to 60% of his truck repair business away from his home. When he is required to bring the disabled truck to his home workshop for repair, he will often work on the truck off-site until it is repaired sufficiently to allow him to drive the truck to his home for further repairs. He prefers not to employ a large tow truck to deliver the disabled truck to his home, due to cost and so as to minimize the frequency of large truck travel in his neighborhood.

11.     The Towns of Charlotte and Monkton will sometimes limit the size or weight of large trucks that may travel on town highways, particularly with back roads that are soft, due to mud season. Mr. Sheldrick has obtained permission, however, from both towns to use his discretion in travelling over dirt roads with large trucks, when necessary to bring them to his home for repair work.

12.     The majority of repairs Mr. Sheldrick performs on trucks falls into five general categories: repair of the brakes, rear ends, transmissions, engines, and electrical systems. He testified at trial, however, that "I repair anything that gets broke on a truck."

13.     Prior to constructing the temporary workshop/garage, Mr. Sheldrick would often work on a disabled truck in his driveway. He installed the single-bay, canvas-sided temporary garage after he was advised that outside work on trucks was not considered a permitted home occupation.

14.     While using the temporary garage, Mr. Sheldrick would sometimes work on trucks outside, in his driveway. Sometimes he would store one or more trucks in his driveway, while the trucks awaited parts or delivery back to their owners. When stored outside, these trucks were visible from Roscoe Road and immediately abutting properties.

15.     In the course of working on trucks, Mr. Sheldrick uses a wide variety of hand- and power-driven tools, including tools powered by an air compressor that he maintains in the existing garage. Mr. Sheldrick also owns and sometimes uses an arc welder in his truck repair business.

16.     In March 2007, Applicants submitted an application for a zoning permit to construct the Proposed Workshop, measuring 35' wide by 50' long or deep. The Proposed Workshop would

4

have 16' sidewalls, a 24' 8" peak, sit on a concrete slab, and be designed to resemble their existing horse barn. The footprint for the Proposed Workshop will be 1,750 square feet.

17. Mr. Sheldrick sized the Proposed Workshop so that each of the two bays would accommodate the largest truck he is called upon to service: a logging truck with a boom and claw device. The design also allows for enough space for Mr. Sheldrick to move around each truck with his tools, while he works. The large overhead doors on each bay will be insulated, so as to diminish the noise that travels beyond the Sheldrick property. Mr. Sheldrick pledges to keep the overhead doors closed while he is using power tools on the property, so as to reduce the off-site noise levels.

18. So as to further reduce the noise his neighbors experience from his business, Mr. Sheldrick pledged to insulate the entire Proposed Workshop and to pipe the air compressor so that air is drawn from the Workshop rafter area.

19. The intended location of the Proposed Workshop complies with all setback and height limitations as set forth in Regulations Table 2.5(E), §§ 3.5–3.6. Applicants presented credible evidence that the Proposed Workshop will be sited in such a manner (in particular, below the grade of their home and existing garage, and set back from the front of the existing garage) so as to diminish the effect of its appearance as viewed from off of their property in general and from Appellants' property in particular.

20. The Proposed Workshop will have two stalls. Mr. Sheldrick's usual work habit is to work on only one disabled truck at a time. However, the new two-stall Workshop would allow him to store one disabled truck inside while it awaited parts, and use the second stall to work on another disabled truck. No disabled trucks would be stored or worked on outside of the Workshop or in Applicants' driveway.

21. The Proposed Workshop is not intended for human occupancy and will not contain a bathroom or other facilities requiring a municipal or state waste disposal permit, pursuant to Regulations § 3.16.

22. There will be no exterior lighting installed on the Proposed Workshop.

23. Only Mr. Sheldrick will work on disabled trucks at his home place. Mrs. Sheldrick maintains the records and bookkeeping for their truck repair business; there will be no other employees for this home occupation.

24. On average, Mr. Sheldrick works on about three trucks per week at his home place. He receives deliveries of spare truck parts and other business supplies about once or twice a day.

The owners of the trucks Mr. Sheldrick repairs rarely travel to his home for business purposes. He and his wife provided credible testimony that their home-based truck repair business would not generate vehicle trips in excess of the 12-trip-per-day limit for Level I Home Occupations, as defined in Regulations § 4.11(A)(1).

25. Applicants provided credible evidence at trial that the loudest piece of equipment in their truck repair business is the air compressor and tools powered by it. This air compressor is currently housed in their existing garage, which is only partially insulated and has un-insulated overhead doors. Mr. Sheldrick provided credible evidence at trial of his estimates of sound levels from the current operation of his equipment. Using a digital sound level meter to test the decibel level of the compressor from various points on their property, Mr. Sheldrick provided a credible estimate that his equipment, when operated in his existing garage with the overhead door open, registered a 52 decibel sound level at the end of their driveway and edge of their property. Applicants also recorded a 68 decibel sound level from an idling truck within their property, at a distance of 25 feet.

26. Applicants also provided credible testimony that their home occupation will not create any excessive or nuisance-level smoke, dust, noxious gases, air pollution, heat, cold, moisture, mist, fog, condensation, electromagnetic or electronic disturbances, or vibrations at their property line. Further, Applicants assert that trash, waste oil, and waste antifreeze generated from the repair business will be safely stored on-site in either a 15-gallon container (primarily for antifreeze) or 55-gallon drums and properly disposed of with the assistance of the Addison County Solid Waste District.

27. Both parties provided credible evidence of the scenic nature of their neighborhood. Many residents and others use Roscoe Road for walking and biking. The existing truck and other vehicular traffic do not appear to cause a material impediment to the use and enjoyment of Roscoe Road for these bikers and walkers.

28. Appellants reside at 1154 Roscoe Road, which is across the road and southwesterly from Applicants' property. Appellants' home is orientated away from Applicants' property; Applicants' home is somewhat obscured from Appellants' home, due to a hedge row on Appellants' property and the lay of the land. There is no doubt, however, that some portion of Applicants' property could be seen from some vantage point on Appellants' property. From the evidence presented, it remained uncertain whether the existing temporary garage or the Proposed Workshop could be seen from any point on Appellants' property. We have no doubt, however,

6

that noises generated on Applicants' property, including noises associated with Applicants' truck repair business, could be heard from some point on Appellants' property.

29.    Due to the easiest traveled way from Vermont Route 7 to Applicants' property, the majority of delivery and to-be-repaired trucks travelling to Applicants' property will travel past Appellants' property. Travel from the north on Roscoe Road is restricted, due to bridges with lower weight limits.

30.    The parties' neighborhood provides many examples of residences with multiple accessory dwellings. Most nearby accessory dwellings are used much like those existing or proposed for Applicants' property: to board horses and other family animals, as well as to house home businesses or occupations.

31.    Appellants' own property includes a barn that is attached to the principal dwelling. Just above Appellants' property is a home property from which the owner runs an active scale production business, with multiple vehicle trips generated per day, including delivery trucks. Other home-based businesses within the vicinity of the parties' homes include the following:

- multiple auto repair businesses;
- body shop or auto painting business;
- a concrete contractor's yard;
- storage businesses;
- an office for a home inspection business;
- a tire sales and repair business; and
- an excavation and law care contractor's yard.

Most, if not all of these properties include accessory structures, some of which house home-based businesses. Examples of these accessory structures are shown on Applicants' Exhibits M through M-8 and W through W-13.

## Discussion

The issues remaining in this de novo appeal are relatively narrow. While the Court appreciates the depth and extensiveness to which both parties presented evidence, researched the legal issues, and proposed findings and legal conclusions, we will endeavor to limit our analysis to the legal issues remaining in this appeal. To the extent that evidence or legal arguments offered by either party is not referenced in this Decision, we have made the specific conclusion that they were outweighed by the facts and legal conclusions recited here.

7

# I.   Proposed Workshop as an Accessory Structure

As we noted in our Interim Decision, the Regulations define an allowable accessory structure as "[a] structure on a lot which is clearly and customarily related and subordinate to the principal structure or use on that lot." Regulations § 10.2.  The Regulations do not set an explicit limit on the size of the accessory structure; the Town has chosen through its Regulations to not limit Accessory Structures by the specific square or cubic feet of the principle structure.

Regulations § 3.6(A)(2) provides some additional guidance by directing that "[a]n accessory structure or use must be clearly subordinate in size, function, and overall appearance to the principal structure or use" and must conform to all requisite setback requirements.  Again, the Regulations do not limit our analysis to a specific mathematical formula or direct comparison to the primary structure.  Rather, we are directed to take a totality of the circumstances approach in our analysis.  This approach leads us to the conclusion that the Proposed Workshop, when compared to the Sheldrick's primary use of the property, which is residential and associated animal care and raising, is a proper accessory structure under the Regulations.

We are convinced in part of our analysis by visiting a hypothetical alternative.  If Applicants were intending to place the Proposed Workshop on a lot that had a single story ranch-style home, within a neighborhood that only had similar homes without accessory structures and home occupations, we might reach a different conclusion.  However, Applicants propose to introduce an accessory structure on a lot that has a multi-story residential building and a permitted temporary garage, in a neighborhood that has an abundance of accessory structures on residential properties, including multiple examples of accessory structures that are used in connection with home occupations.

Given the totality of the circumstances test directed by Regulations §§ 3.6(A)(2) and 10.2, we conclude that the Proposed Workshop represents a structure that is "customarily related" to the primary use on the Sheldrick property, particularly when viewed in context with the established neighborhood practice of home-based occupations on area residential properties. When viewed within the context of Applicants' residential dwelling and the adjacent accessory structures that they use in connection with their residence, we conclude that the Proposed Workshop is subordinate, particularly in light of its proposed siting, such that it will be partially obscured by Applicants' residence and existing personal garage.

## II.     Proposed Workshop as a Home Occupation

We left a final determination of whether Applicants' proposed use of the Workshop to house their truck repair business could be classified as a Level I Home Occupation until after our determination on the admissibility of the Workshop as an allowable accessory structure. Interim Decision at 9–10. We came to this conclusion by noting that it then appeared undisputed that Applicants' business satisfied the other elements for a Level I Home Occupation found in Regulations § 4.11(A)(1):  that the home-based business (a) would only employ dwelling residents; (b) would be conducted wholly within the proposed accessory structure; and (c) will generate no more than twelve business-related trips per day. Id. The evidence presented at trial did not contradict these material facts.

When a home-based business satisfies the criteria for a Level I Home Occupation, its continued use does not require a zoning permit. Id.; see also Regulations Table 2.5(B)(4). Given the absence of conflicting evidence, we agree with Applicants that their home-based truck repair business is a Level I Home Occupation and is not otherwise prohibited by the Regulations.

## III.     Performance Standards for Home Occupation

We must also determine whether Applicants' Proposed Workshop conforms to the performance standards of Regulations § 3.12. We first note a bit of a quandary, since the only application before us is the construction of the Proposed Workshop. No use application has been ruled on below and it would thus be improper for this Court to rule on such an application in the first instance on appeal. In re Torres, 154 Vt. 233, 236 (1990). The language of Regulations § 3.12(A) makes clear that these performance standards relate solely to the "use" of a property.

We also note that the verbiage of § 3.12(A) could be read, as Applicants suggest, to be enforcement-related conditions and not standards upon which an application is to be judged. We decline to adopt that assessment, since the standards established by § 3.12(A) provide a limitation upon the uses that are allowed "in all districts." Id. Further, § 3.12(A) places "the burden of proof . . . [upon] the applicant."

However, because the Proposed Workshop construction is so intertwined with its use, and because of the extensive presentation of facts and legal analysis the parties have offered, we provide the following assessment of the Proposed Workshop's conformance to the § 3.12(A) performance standards.

9

First, we note that conformance to many of the performance standards are not in dispute. Applicants represent that their Workshop or its use as a truck repair home occupation will not generate, at their property line, clearly apparent levels of vibration, smoke, dust, noxious gases or other forms of air pollution, detrimental heat, cold moisture, mist, fog or condensation, electromagnetic or electronic disturbances, glare, lumen, light or reflection, liquid or solid waste or refuse that will cause an undue burden on municipal or public disposal facilities, or undue fire, safety, explosive, radioactive emission, or other hazards. Thus, the evidence presented allows us to render positive findings as the performance standards articulated in §§ 3.12(A)(2) through (8).

The sole remaining performance standard to address is noise; specifically whether the addition of the Proposed Workshop will "cause or result in . . . noise in excess of 70 decibels, or which represents a significant increase in noise levels in the vicinity of the use so as to be incompatible with the surrounding area." Regulations §§ 3.12(A) and 3.12(A)(1). Mr. Sheldrick provided credible evidence that his existing truck repair business does not produce noise in excess of 70 decibels at their property line. Moving all his equipment and the trucks he works on into a new, fully insulated Workshop, with fully insulated doors and a re-piped compressor can only diminish the noise levels experienced in the vicinity of Applicants' property. We further note that the surrounding neighborhood already generates a consistent number of delivery trucks, including FedEx, UPS, and oil and gas delivery trucks. We also have the benefit of the neighborhood experiencing a form of Mr. Sheldrick's truck repair business. While we found credible Appellant's testimony as to what he experienced in the way of neighborhood truck noise, we note that several more of Applicants' neighbors came forward to provide credible testimony that Mr. Sheldrick's operation of his home-based truck repair business did not result in a noticeable or significant increase in noise levels in their neighborhood. For all these reasons, we conclude that the Proposed Workshop and its use, if constructed and operated as represented, will conform to Regulations § 3.12(A)(1).

### Conclusion

For all the reasons more fully discussed above, we hereby **GRANT** Applicants' request for a zoning permit to allow for the construction of their Proposed Workshop, subject to the following conditions:

1. Applicants shall submit final drawings of the Proposed Workshop, demonstrating that it will resemble the horse barn on their property, will include insulated doors, and will not contain exterior lighting; and

2. Applicants may use their Proposed Workshop for the purpose of conducting a Home Occupation, Level I, provided such use complies with the existing Performance Standards, as set out in Regulations § 3.12, and the limitations on employees, vehicle trips, and restriction on outside work and outside storage of vehicles, supplies and equipment, as contained in Regulations § 4.11. Further use conditions, including those imposed upon all Level I Home Occupations, are as follows:

   a) The large overhead doors shall be insulated, and they shall be closed anytime that power tools are being operated at the Proposed Workshop.

   b) The entire Proposed Workshop shall be insulated, and the air compressor intake shall be piped so that air is drawn from the rafter area.

   c) Applicants shall site the Proposed Workshop below the grade of the existing exterior grade of their house and set back from the front of their existing garage.

   d) All disabled trucks of customers shall be stored and worked on inside the Proposed Workshop, not in the driveway or anywhere else on the premises.

   e) No exterior lighting may be installed on the Proposed Workshop.

   f) No other employees may work at the Proposed Workshop.

Accordingly, we specifically **DENY** Appellants' appeal of the zoning permit first issued by the Town of Charlotte Zoning Administrator and later upheld by the Charlotte ZBA.

This matter is remanded back to the Charlotte Zoning Administrator solely for the purpose of completing the ministerial act of issuing a revised Zoning Permit in conformance with this Merits Decision and the accompanying Judgment Order.

This concludes the proceedings before this Court in this appeal.[5]

Done at Newfane, Vermont, this 23rd day of April 2009.

_____
Thomas S. Durkin, Environmental Judge

---

[5] As noted in a separate Entry Order issued on April 1, 2009, in light of our ruling in this Merits Decision, Applicants' recent post-trial motion is now moot. Given that we have found that Applicants' permit application should be granted even under the Regulations that were in effect at the time Applicants submitted their application, we need not address the legal issue of whether an applicant has the right to elect to have an application evaluated under bylaws that were enacted after the close of a trial and before the court has issued its decision.